IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

I.R.                                    :
     Plaintiff,                       :
                           :
                           :
                           :   CIVIL ACTION
v.                                      :
                           :   FILE NO.: 1:22-cv-00848-MHC
RITI, INC d/b/a AMERICAN INN           :
& SUITES,                               :
                           :
     Defendant.                       :

## PLAINTIFF I.R.'S RESPONSE TO DEFENDANT RITI, INC. D/B/A AMERICAN INN & SUITES' MOTION FOR SUMMARY JUDGMENT

Matthew B. Stoddard, Esq.
Belle-Anne B. Cooper, Esq.
The Stoddard Firm
1534 N. Decatur Road NE
Atlanta, GA 30307
Tel: 470-467-2200
Fax: 470-467-1300
matt@legalhelpga.com
ba@legalhelpga.com

**Attorneys for Plaintiff**

# TABLE OF CONTENTS[1]

Statement of Facts.................................................................................5

    I.     Defendant Oversaw a Sex Trafficking Market At Its Hotel ...............5

    II.    Police Frequently Witnessed Sex Crimes At Defendant's Hotel……..8

    III.   Customers Also Reported Sex Crimes To Defendant………………11

    IV.   Plaintiff (fifteen) Was Repeatedly Raped At Defendant's Hotel……12

    V.    Defendant's Only Goal Was Profits…………………………………17

Legal Standard.................................................................................18

Argument and Citation of Authority....................................................19

    I.     Defendant Violated The TVPRA.......................................................19

        a.    Element One: Defendant Knowingly Benefitted.....................20

        b.    Element Two: Defendant Participated in a Venture.................21

        c.    Element Three: The Venture Violated The TVPRA................23

        d.    Element Four: Defendant Knew or Should Have Known……24

        e.    Defendant's Rule 19 Argument Is Inapposite………………..26

    II.    Defendant Violated Georgia RICO…………………………………29

        a.    Defendant Acquired An Interest In Room Rental Money…....29

        b.    Defendant Engaged In A Pattern of Racketeering Activity…..30

---

[1] Plaintiff has limited briefing to thirty-five (35) pages, excluding tables of contents and signature pages, as allowed by this Court's order. Doc. 121.

(b)(1) Defendant Kept a Place of Prostitution………….……31

(b)(2) Defendant Was Party to the Crimes
of Pimping and Prostitution…………………………32

(b)(3) Defendant's RICO Violations
Led to Plaintiff's Injuries……………………………....33

(b)(4) Defendant Engaged in a RICO Conspiracy……...……34

III.   Defendant Violated Georgia's Premises Liability Statute…………..35

IV.   Defendant Harbored A Nuisance On Its Property………………......38

Conclusion.....................................................................................................39

# TABLE OF EXHIBITS

Ex. 1          Deposition of Kaushal Patel

EX. 2          Deposition of S.M.

EX. 3          Deposition of K.H.

Ex. 4          Deposition of Candace Wertzberger

Ex. 5          Compilation of Clayton County Police Department Incident Reports

Ex. 6          Deposition of Detective Marco Cooper

Ex. 7          Clayton County Police Department Crime Grid

Ex. 8          Deposition of Lieutenant Ricky Porter

Ex. 9          Deposition of I.R.

Ex. 10         Compilation of Online Reviews

Ex. 11         Clayton County Incident Report

Ex. 12         Defendant's Responses to Plaintiff's First Interrogatories

**STATEMENT OF FACTS**

## I.   Defendant Oversaw a Sex Trafficking Market At its Hotel.

From 2007 through 2022, Defendant Riti owned and managed a hotel in Jonesboro Georgia first called the America's Best Value Inn and then later called the American Inn & Suites. Ex.1, Kaushal Patel,13:6-21;18:2-15;38:2-3.  During Defendant's stewardship, large numbers of women were sold for sex at the hotel in an open and obvious way such that Defendant knew what was happening.  In some instances, Defendant's participated and aided the traffickers.

From "2012 to 2015", a "guy named Rowdy" sold "multiple girls.  More than ten" girls for sex at the hotel. Ex.2, S.M. 37:13-21, 38:9-11.  One of those girls was S.M.  S.M. was "with multiple girls and Rowdy" "for more than a week at a time" (and multiple different times) where she was "forced to have sex with men for money" and then the "money [went] to Rowdy." *Id*. 40:7-21.  When S.M. was "at Riti, [] there [were] more than four [sex worker] girls in a room" "sometimes." *Id*. 40:22-24.  According to S.M., Defendant "knew what [Rowdy] was doing" "because [Defendant] seen the traffic back and forth, men coming back and forth, in and out of the room.  It was a non-stop thing" with "more than ten men a day" "per girl" such that with "four to five girls in the room, there were, like, 40 to 50 men per day" "going into one hotel room at Riti" and Rowdy "would

have more than one room" of victims being trafficked. *Id*. at 42:16-43:19.

One of the reasons, S.M. "believes that Riti [knew about the trafficking is], that [Defendant's] workers would have observed the 30 plus men a day going in and out of the room[s]" because the girls being trafficked by Rowdy "weren't the only girls that were there." *Id*. 42:23-43:10. According to S.M., Rowdy "wasn't the only pimp that was there [either.] [] There was other groups of girls with different people [] different pimps." *Id*. 43:23-44:10. And S.M. knows that Defendant knew about the sex trafficking because when S.M. "got a chance to go outside to smoke [] cigarette[s]" she was "able to observe persons that worked for [Defendant] watching a constant flow of men going in and out of the rooms." *Id*. at 44:20-25; 45:13-19.

S.M. also identified some of Defendant's owners and said those owners would only kick out traffickers when Defendant "fe[lt] like that the police is watching, and you got too much traffic. . ." *Id*. 48:4-15. S.M. "got slapped a couple times and punched in [her] eye" by Rowdy while being sold for sex at Defendant's hotel, and she observed Rowdy beating some of the other girls too and sometimes S.M. was "struck because [she] refused to have sex while [] at Riti." *Id*. 50:23-51:4;51:4-24

Another trafficking victim, K.H., testified she was only 16 years old when

she was first trafficked for sex at Defendant's hotel in 2011 by a trafficker named Darrell. Ex.3, K.H. 82:25-83:12;120:11-121:3. K.H. was forced to engage in hundreds of commercial sex acts over a period of years at Defendant's hotel at a frequency of 30-40 men per day. *Id*. 256:1-9. K.H. also witnessed – nearly every day – other women who were engaging in prostitution at Defendant's hotel. *Id*. 257:7-10;158:2-159:4;172:20-173:6;175:5-11. And like S.M., K.H. recognized Defendant's owners and managers. K.H. would see those managers "every day that [she was at] the hotel," she had "spoken with them on several occasions" and was even "asked [by them] did [she] want to be a housekeeper" at the hotel. *Id*. 253:15-254:25. Importantly, K.H. was present when Defendant's managers told her trafficker "Darrell about, um, paying extra for the rooms and stuff" because "if they see traffic at your door [from sex work,] they'll make you pay extra instead of putting you out." *Id*. 255:1-17

Another person who observed Defendant's operation of a sex trafficking market was Candace Wertzberger. Candace was the founder of a local non-profit organization called 'the Hiding Place', and she brought food, toiletries, and other similar items to victims living at Defendant's hotel on a weekly basis for almost two years. Ex. 4, Wertzberger 7:1-9:5;13:1-19;14:1-16:7; 30: 4-21;32:12-19. Wertzberger vividly described what was happening: "[y]ou could just stand in the

parking lot and watch the men drive around back and pick up a girl . . . you could watch it happen over and over and over while we were out there" and "the amount of prostitution and trafficking . . . it was unreal." *Id*. 12:1-11;13:1-25;29:1-23.

Wertzberger recalled one occasion at Defendant's hotel where "[she] had a girl get into [her] car and she had the trafficking line on the phone . . . and at the last minute [the girl] got scared and ran off." *Id*. 15:1-18.  On another occasion, Wertzberger alerted authorities about a trafficking victim at Defendant's hotel that she believed was twelve years old. *Id*. at 10: 5-11:25, 33:1-37:24; Ex.5, [2] Bates Labeled Pl's Compilation of CCPD Reports at 000001. Wertzberger also alerted authorities of a minor being trafficked for sex at Defendant's hotel on a separate occasion. Ex. 4, Wertzberger, 48:20-49:15.

Wertzberger always notified management when she was on property "to talk to the girls", but Wetzberger's interactions with management were "not friendly encounters" especially since management denied her requests to post an anti-trafficking flyer in the hotel lobby. *Id*. 42:16-46:8.

## II.     Police Frequently Witnessed Sex Crimes At Defendant's Hotel.

During Defendant's ownership of the hotel, police reports described the

_____

[2] Plaintiff is filing a compilation of Clayton County Incident Reports as Exhibit 8, for which citations are the page numbers affixed by Plaintiff as Bates Labeled Pl's Compilation of CCPD Reports.

hotel and its parking lot as a "high crime area known for drug sale, prostitution, and other crimes." Ex. 5, CCPD Reports at Bates Labeled Pl's 000022-0000025; 000055-000056; 000088-000089.

Detective Marco Cooper elaborated at deposition that Defendant's hotel is "specifically known to law enforcement for prostitution." Ex. 6, Cooper 13:12-25. This makes sense. As one example, in August 2013 hotel manager Vinaben Patel admitted to police that a female was "prostituting for money with custom[er]s at the location." Ex.11, Clayton County Incident Report.

But this was not a one time issue. Clayton County Police Department responded to over one thousand-one hundred incidents at Defendant's hotel from 2013 through March 2020 with numerous incidents related to allegations of prostitution and minors being trafficked for sex.[3] Law enforcement identified Defendant's hotel as "one of our busiest areas in that sector, and in the county… you could consider it a hub for crime." Ex. 8,Porter 21:23-22:1; *see also* Ex.6, Cooper "high crime area". ) And Law enforcement testimony confirms that women

---

[3] Ex.7, Clayton County Police Department Crime Grid; Ex. 5, CCPD Compilation at Bates Labeled Pl's at 000002-000012 (five arrests for pandering/solicitation); 000015-000018 (investigation of 5 juveniles being trafficked); 000019 (rape and child molestation); 000022-000025(prostitution and pandering); 000026-000054 (13 arrests for pandering/solicitation); 000057-000058 (person shot);000059 (prostitution of minor); 000060-000064(prostitution, possession of cocaine, suspect told officers "people pay her for sex and she will knock on motel doors to get her money");000068-000069 (robbery and prostitution); 000076-000079(reported suspects "were pimping out [two] juveniles to pay for the room); 000080-000083(shooting).

were openly engaging in prostitution at Defendant's hotel. Ex.8,Porter 22:11-23:4;37:2-39:2; *see also* Ex.6,Cooper,17:14-19:21. In fact, Detective Cooper conducted over ten human trafficking investigations at Defendant's hotel. *Id.* 21:1-9;29:3-14; *see also* 26:2-12 (sex trafficking was happening); Ex.8,Porter 25:15-26:5 (same).

Another officer, Lt. Porter responded to Defendant's hotel nearly a hundred times with "a quarter of them as prostitution reports, people saying that there is … multiple people coming to the same room, leaving shortly thereafter." Ex.8, Porter 14:1-15:3. Lt. Porter investigated "probably over a dozen" instances of human trafficking and conducted "several investigations … where [he] believed juveniles were being prostituted." *Id.* 14:9-19; 16:10-17. Lt. Porter described a specific instance in September 2015, when he was working as a detective specializing in crimes against children, where he responded to Defendant's hotel to investigate allegations of five minors being sold for sex at the property. *Id.* 11:13-13:8;28:13-23, Ex.5,CCPD Compilation at Bates Labeled Pl's 000015-000018. Law enforcement also investigated Defendant's manager, Ishverbhai Patel, for soliciting a child for indecent purposes after receiving reports Patel told a hotel guests' minor daughter, "let [me] touch her booty or pay for the room." Ex.5,CCPD Compilation at Bates Labeled Pl's 000072-000075.

Contrary to Defendant's assertions, Officers responding to Defendant's hotel would routinely come in contact with hotel staff during the course of their investigation. Ex.6,Cooper 12:11-17; Ex.8, Porter 9:34:9-25.  Unfortunately, Defendant's employees – including its management – were not helpful and refused to cooperate with police.  Ex.6, Cooper 23:7-24:7; Ex.8, Porter 26:6-27:12.  In fact, Law enforcement believed that "people involved in these trafficking rings had access to the cameras on the property" which led to an investigation into this hotel "[b]ecause it did become an officer safety concern as well as enabled victims to be victimized much easier." *Id.* 15:16-16:6; 39:10-20; 40:5-41:10; 20:5-25.  Detective Cooper also described a "security room" located in the back corner of the hotel where criminals had access to the surveillance footage. Ex.6, Cooper 32:21-33:4.

## III.    Customers Also Reported Sex Crimes To Defendant.

In addition to victims, aid organization, and law enforcement, the few legitimate customers that happened to stay at Defendant's hotel would likewise report what was happening to the public at large, and Defendant received copies of those reports.  Just a sampling of these online reviews (2017 and 2018) read:[4]

- "[k]nown as a high prostitution, drug area it is advised unless you're into either you should steer clear…" (Ex.10, Customer of Reviews, Pl's

---

[4] Plaintiff is filing a compilation of online customer reviews of Defendant's property as Exhibit 10, for which citations are the page numbers affixed by Plaintiff as Bates Labeled Pl's Compilation of Review.

Compilation of Review 000007)

- "[n]eeds renovating and security; badly! Not a safe place to stay! Drugs and prostitution running rampant!!!" (*Id.* at Pl's Compilation of Review 000001)

- "[i]ts not a good place to stay in and yall need to get the crack heads out the walls." (*Id.* at Pl's Compilation of Review 000002)

- "[g]hetto as hell it's a big trap house and a lot of prostitution does on here it's disgusting!" (*Id.* at Pl's Compilation of Review 000002)

- "the people that the hotel have soliciting around there []there's human traffic[k]ing there all day the owners don't care..." (*Id.* at Pl's Compilation of Reviews 000003)

- "[t]his a damn TRAP hotel . . . it's heavy dope slangers and prostitutes hangin out watching the newcomers coming in." (*Id.* at Pl's Compilation of Review 000004)

- "high drug trafficking, HOOKER ALERT, CONSISTENT POLICE appearances." (emphasis in original) (*Id.* at Pl's Compilation of Review 000005)

- "the owner is very disrespectful to guest..touching young girls..so if u have a teen BEEE CAREFUL!! (emphasis in original) (*Id.* at Pl's Compilation of Review 000006)

In short, Defendant created and maintained a sex trafficking drug den and everyone who visited the property witnessed what was happening.

## IV. Plaintiff (fifteen) Was Repeated Raped At Defendant's Hotel.

In March 2020, then fifteen-year-old I.R. was trafficked for sex at Defendant's hotel by Shanequa Welch and her associates. At the time, Welch told

I.R. that Welch "had [already] been locked up before for trafficking" another minor at Defendant's hotel. Ex.9, I.R. 169:1-21;170:4-25;178:19-179:16;255:19-24;36:19-37:18.  During I.R.'s trafficking "[she] was scared [Welch] was going to do something to [her] . . . [if she] disobeyed her" and Welch would often refer to I.R. as her property. *Id*. 178:12-14; *see also id.* 184: 21-25 (Welch said I "was her ho, [I] belonged to her. And [I] wasn't going home."). Per local police, Welch was known in the area and had a reputation as a trafficker who would "bounce from American Inn & Suites and another hotel in the area . . . selling herself out and also recruiting or putting other girls into the sex trafficking game." Ex.6, Cooper, 38: 1-21; 39: 2-40:1.  That is exactly what happened to I.R.

Specifically, Welch and her associate "Chocolate" approached I.R. and another minor female in Defendant's parking lot and offered to help them. Ex. 9, I.R. 21:18-24 (she told us "as long as we paid our fee, we wouldn't have nothing to worry about.").  That evening, Welch advertised IR and the other girl for sex on Listcrawler and Megapersonals. *Id*. 134:6-136:2.

The first night I.R. was trafficked at Defendant's hotel, there were at least 25 men "back-to-back" with each date lasting "no longer than 15 minutes." *Id*.136:12-22.  And I.R. described a continuous flow of foot traffic to "Chocolate's" room that

first night too with over 36 men coming and going.[5]  Welch refused housekeeping

services, but shortly thereafter, I.R. went to the maid to request additional towels

for the room. *Id*. 152:17-153:25; 246:16-22.  I.R. was wearing a crop top and

shorts and the maid had clearly observed the room's traffic flow. *Id*. 266:3-11.

I.R. was thereafter trafficked at Defendant's hotel "every other day" over a

twelve to fourteen day period.  *Id*. 244:23-10.   Welch, who had an outstanding

criminal warrant, had her associates and fellow gang members rent the hotel rooms

so Welch could evade police. *Id*. 185:11-17; 186:4-12.   This is typical – Lt. Porter

testified "probably 75% of our prostitution cases have either an unattached party or

just a regular citizen renting that room for the individual." Ex.8, Porter 19:12-15.

And contrary to Defendant's repeated assertions, there is evidence in the record

showing Welch had fellow bloods gang-member "Rico" rent the room where the

sex acts occurred. Ex.9, I.R. 186:13-25;187:1-25.  I.R. testified specifically that she

witnessed "[Welch] g[i]ve him money for the room … and he went into the office.

And came out piece of paper and the [room key] cards." *Id*. 187:15-19.  After Rico

paid, I.R. made eye contact with a hotel employee while being escorted to the room

where I.R. was forced to engage in commercial sex acts. *Id*. 191:3-23; 206:2-9.

---

[5] I.R. testified the other minor, C.S., engaged in "more than ten" commercial sex acts that same
night and Chocolate engaged in at least one commercial sex act that evening.  Ex. 9, I.R. 133:1-
134:5; 136:25 -137:5; 185:18-21

The sheer volume of foot traffic to and from the rooms where I.R. was trafficked was indicative of sex trafficking as she engaged in over 50 commercial sex acts at Defendant's hotel with an average of 10 men per day.[6] Apparently, the constant parade of men coming and going from I.R.'s room drew the attention of hotel management who "knocked on I.R.'s door and told [her] that [she] was having too much traffic [and] that he was watching on the camera." *Id*. 222:13-23. The manager did not call police or remove the trafficker from the property. Instead, he aided the trafficking by merely alerting the victim that the trafficking was too obvious, and when fifteen-year-old I.R. answered the door, I.R. was only wearing a "red bra and shorts." *Id*. 229: 5-7.  I.R. messaged her trafficker:



> +14707988825 Lil Red
>
> And the man jest knocked onna door he said don't have traffic threw the thing he watching the camera
>
> Status: Sent
> Delivered: 3/30/2020 7:21:47 PM(UTC-4)
>
> 3/30/2020 7:21:46 PM(UTC-4)

Welch forced I.R. to continue engaging in commercial sex acts despite the warning from management. *Id*. 227:9-25.  Welch later forced I.R. to continue engaging in commercial sex acts even after I.R. learned she was pregnant, and again after forcing a crude abortion procedure in Defendant's hotel room – an assault.  *Id*.

---

[6] Ex. 9, I.R. 136:9-22;206:2-207:15; 218:17-22; 221:24-222:23;227:14-21; 231:15-21;236:13-23.

232:17-20; 236:18-237:6.

Defendant did not just observe the sheer volume of traffic to the room. I.R. also exhibited numerous well-known signs of minor sex trafficking. As to her inappropriate appearance, I.R. testified she was "never fully clothed" while walking in the hotel's common areas. *Id*. 250:3-21. She further testified that she appeared malnourished and sleep deprived because she was often times required to engage in commercial sex acts until "the sun [came] up" and Welch fed her cocaine and Xanax daily. *Id*. 140:13-141:1; 162:17-25; 250: 3-18; 251:1-8.

I.R. described direct interactions with at least three of Defendant's employees wearing little to no clothing. *Id*. 266:3-11. On one occasion, a male employee followed I.R. as she walked around the property and I.R. testified she was "never fully clothed" while at Defendant's hotel. *Id*. 250:3-251:22. A young girl walking around the hotel common areas wearing little clothing during the daytime should have been a red flag to Defendant, especially, since a minor, such as I.R., should have been in school during the day. *Id*. 229:11-18; 247:16-21. There were other red flags that should have alerted Defendant to I.R.'s trafficking such as I.R.'s trafficker routinely turning down housekeeping services and making I.R. retrieve extra towels from housekeeping. *Id*. 152:10-25.

## V.     Defendant's Only Goal Was Profits.

In describing hotel managements' relationship with law enforcement, one officer testified "[i]n my opinion, it seems like they would rather turn a blind eye to certain crimes than report it. If you were at this hotel – if I were a fly on the wall at the hotel, it's obvious to see what kind of crimes are going on at this hotel day in and day out." Ex.6, Cooper 34:4-11; *see also* Ex.8, Porter 35:13-25.  Despite the obvious criminal conduct occurring on the property, Defendant's employees rarely contacted police as the majority of calls to the police were "from other patrons." Ex.6,Cooper 24:7-14.[7]  And officers oftentimes "ha[d] issues getting video surveillance, getting information they need." *Id.* 23:15-24.  Why?  Well according to the police, "if the persons [who] rent out the room know[s] that the management is cooperating [with cops], maybe they do not want to stay there." *Id.* 23:1-24:7. And according to victim K.H., if management witnessed heavy foot traffic "they'll make you pay extra instead of putting you out." Ex. 3, K.H. 254:10-255:17.

Defendant had no safety plan in place as it related to deterring trafficking and those working at the hotel never received any training about it. Ex.10, Kaushal Patel 89:20-1;94:6-95:9; 95:12-16;104:2-5; *see also* Ex. 12, Defendant's Responses to Plaintiff's First Interrogatories. Rather, according to Defendant's

---

[7] When describing what measures Defendant could implement to deter crime at the property, Officer Cooper testified "[m]aybe the clerks call in more often, crimes reported." 22:5-19.

owner Kaushal Patel, Defendant had a "commonsense" policy of "see something, say something." *Id.* at 88:16-90:15. Yet, the evidence suggests Defendant failed to adhere to its own policy because the hotel manager confronted fifteen-year-old I.R., wearing only a "red bra and shorts" for having "for having too much traffic" "that he was watching on the camera," and he did not say anything to anyone. Ex.9, I.R. 222:13-23; 223:21-224:25;229:5-7. Lastly, according to law enforcement Defendant failed to adopt common sense practices to deter traffickers and instead chose "no controlled access [], . . . [and] no individual patrolling the property" Ex.8, Porter 16:18-17:3.

## LEGAL STANDARD

At the summary judgment stage, the "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Butler v. Gualtieri*, 41 F.4th 1329, 1334 (11th Cir. 2022) (*quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," so they are not appropriate determinations to make at the summary judgment stage. *Id.*

In reviewing motion for summary judgment, "all reasonable doubts about facts should be resolved in favor of nonmovant, and if reasonable minds might

differ on inferences arising from undisputed facts, then court should deny summary judgment." *Thrasher v. State Farm Fire & Cas. Co.,* 734 F.2d 637, 639 (11th Cir. 1984). Summary judgment is appropriate only if a case is "so one-sided that one party must prevail as a matter of law." *Blash v. City of Hawkinsville*, 856 F. App'x 259, 263 (11th Cir. 2021).

## ARGUMENT AND CITATION TO AUTHORITY

**I.     Defendant Violated The TVPRA.**

The TVPRA's provides civil remedies to human trafficking survivors. 18 U.S.C. § 1595(a).  One remedy is the 'beneficiary provision' which states:

> An individual who is a victim of a violation of this chapter may bring a civil action against. . .whoever knowingly benefits financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter. . .and may recover damages and reasonable attorney's fees.

While there is scant appellate law interpreting the TVPRA's beneficiary provision, the Eleventh Circuit has addressed the provision at the motion to dismiss stage and articulated that the claim requires proof of the following four elements:

> (1) knowingly benefited, (2) from taking part in a common undertaking or enterprise involving risk and potential profit, (3) that the undertaking or enterprise violated the TVPRA as to the plaintiff, and (4) the defendant had constructive or actual knowledge that the undertaking or enterprise violated the TVPRA as to the plaintiff.

*Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 726 (11th Cir. 2021). These four elements are based on the plain language of the TVPRA. There is sufficient evidence of each element to create a jury question as to Plaintiff's TVPRA claim.

### a. Element One: Defendant Knowingly Benefited.

I.R. easily meets this standard, which requires evidence that "the defendant knew it was receiving some value." *Red Roof*, 21 F.4th at 724. Contrary to Defendant's assertions, there is evidence in the record showing Welch's associates rented rooms at Defendant's hotel and I.R. was subsequently sold for sex in said rooms. The first night I.R. was trafficked at Defendant's hotel in a room rented by Welch's associate "Chocolate" where she engaged in commercial sex acts with at least 25 men "back-to-back" with each date lasting "no longer than 15 minutes" (Ex. 9, I.R. 136:12-22) until "the sun [came] up." *Id.* 140:13-141:1. On another occasion, Welch had a fellow bloods gang-member known only to I.R. as "Rico" rent the room in his name "[Welch] gave him money for the room … and he went into the office. And came out piece of paper and the cards." *Id.* 187:15-19;186:13-25. Thereafter, Welch escorted I.R. to said room where she forced I.R. to engage in commercial sex acts with at least 10 men. *Id.* 191:3-23;206:2-9. Thus, there is sufficient evidence to create a question for the jury as to whether Defendant

knowingly benefited by collecting revenue from the room rentals in which I.R. was forced to have sex in.

### b.  Element Two: Defendant Participated In A Venture.

In this action, I.R. easily satisfies *Red Roof's* plain-meaning interpretation of participation. "Participation in a venture" requires evidence that Defendant "took part in a common undertaking or enterprise involving *risk* and *potential profit*." *Red Roof,* 21 F.4th at 725 (emphasis added). The record shows Defendant rented rooms to Plaintiff's traffickers "every other day" over the course of several weeks in March 2020. More specifically, the record shows Defendant took part in a common undertaking or enterprise involving risk and profit with Plaintiff's traffickers, Welch and her fellow "Bloods" gang members, because Defendant directly rented rooms to people it knew or should have known were engaged in sex trafficking, including the sex trafficking of I.R. "Having prior commercial dealings with the [abuser]" and thereafter "renting a room to the abuser" "establish[es] a hotel operator's participation in a venture." [8] *Red Roof*, 21 F.4th at 726.

---

[8] This rule from *Red Roof* is the majority view. Even before *Red Roof* was decided, district courts "f[ound] it sufficient for Plaintiff to plead that Defendants participated in a venture by continuously renting rooms to individuals that it [] should have known were involved in sex-trafficking." *S.Y. v. Best Western Int'l, Inc.*, 2021 WL 2315073 *4 (M.D. Fla. June 7, 2021); *C.S. v. Choice Hotels Int'l, Inc.*, 2021 WL 1966431 (M.D. Fla. May 17, 2021) (same); *See also Doe #1 v. MG Freesites, Ltd*, 2022 WL 407147 *17 (N.D. Ala. Feb. 9, 2022)(all that is required is "a continuous business relationship between the trafficker and Defendant. . ."); *Doe v. Rickey Patel,*

Nothing more is needed to establish Defendant's participation. Defendant *directly* provided Plaintiff's traffickers with the rooms –the literal space—in which I.R. (a minor) was forced to have sex with over fifty men for money. Repeated room-rentals to sex traffickers does show a continuous business relationship.[9] Without the rooms, then fifteen-year-old Plaintiff would not have been trafficked.

In addition to the evidence showing Defendant's continuous business relationship with Plaintiff's traffickers, there is also evidence of Defendant's participation in the venture by aiding Plaintiff's traffickers and ignoring the numerous signs of a minor trafficking victim. Here, Defendant's manager aided in the trafficking of I.R. by warning I.R. about the heavy foot traffic he observed coming and going from I.R.'s room rather than alerting authorities. Ex.9, I.R. 222:13-23;223:21-224:25. And I.R. was forced to continue engaging in commercial sex acts inside Defendant's room even after the manager warned her of "too much traffic." *Id.* 227:9-25. Thus, Defendant's failure to act directly contributed to I.R.'s continued victimization.

---

*LLC*, 2020 WL 6121939 *5 (S.D. Fla. Sept. 30, 2020)(same); *Heidemann v. Red Lion Hotel Corp.*, 1:20-cv-04001-LLM (N.D. Ga. Sept 24, 2021).
[9] *see M.A.,* 425 F. Supp. 3d at 970-71 (where "M.A. alleges that the hotels repeatedly rented rooms and thereby 'participated in the trafficking," "[t]his Court finds Plaintiff has alleged sufficient facts to show that Defendants 'participated in a venture' under § 1595 by alleging that Defendants rented rooms to people it knew or should have known [were] engaged in sex trafficking").

Defendant knew or should have known of I.R.'s trafficking because I.R. exhibited obvious signs and behaviors of a minor trafficking victim such as her age and inappropriate appearance while walking around the hotel "barely clothed" throughout the daytime when a child her age should have been in school, the constant flow of men coming and going from the rooms where I.R. was forced to engage in commercial sex acts with men "back to back", as well as the other indicia of minor sex trafficking I.R. exhibited discussed in detail. *See I.R. supra.*

### c. Element Three: The Venture Violated the TVPRA.

There is sufficient evidence to support Plaintiff's claim that she was "recruit[ed], entic[ed], harbor[ed], transport[ed], provide[d], obtain[ed], maintan[ed], patronize[d], [and] solict[ed] [by Welch and her gang who] kn[ew] that [I..R.] ha[d] not attained the age of 18 and [who] caused [I.R.] to engage a commercial sex act." 18 U.S.C. 1591(a). Welch certainly knew I.R. was a minor. Ex.9, I.R. 120:2-9. The acts occurred in Defendant's hotel rooms. *See supra.* The venture therefore violated the TVPRA as to I.R. These actions violated the TVPRA, the test is met, and Defendant does not appear to dispute it. There was force / threats of force too although not such is not required for minors like I.R. *See* 18 U.S.C. 1591(a).

**d.    Element Four: Defendant Knew or Should Have Known.**

To establish the last element of her TVPRA claim, Plaintiff does not need to show that Defendant had actual knowledge of these trafficking violations. *Doe#1*, 21 F.4th 725. Instead, Plaintiff must show only constructive knowledge, "that knowledge which 'one using reasonable care or diligence should have.'" *Id.* (quoting Black's Law Dictionary). The constructive knowledge standard is a fact-intensive one requiring the jury to consider the totality of circumstances. *See, e.g., Allen v. Bd. of Pub. Educ.,* 495 F.3d 1306 (11th Cir. 2007) (applying a fact-intensive inquiry to constructive knowledge in FLSA case); *Ga. CVS Pharm., LLC v. Carmichael*, 316 Ga. 718, 726 (2023) (same in negligent security case).

To assess constructive knowledge, courts consider the conduct's pervasiveness. *See e.g., Henson v. City of Dundee*, 682 F.2d 897, 905 (11th Cir. 1982) (the "pervasiveness of the harassment" gives rise to the inference of knowledge or constructive knowledge in a Title VII hostile work environment claim). In the context of a TVPRA beneficiary claim, courts also consider the defendant's "failure to implement policies sufficient to combat a known problem in one's operations." *M.A. v. Wyndham Hotel & Resorts, Inc.,* 425 F.Supp.3d 959, 968 (S.D. Ohio 2019). Indeed, if the signs were there and the Defendant simply turned a blind eye—not exercising reasonable diligence to uncover TVPRA

violations—the constructive knowledge element is satisfied. *Id. see also J.G. v. Northbrook Indus., Inc.*, 2022 WL 4482735, at *6–7 (N.D. Ga. Aug. 2, 2022) (similar allegations supported a claim of constructive notice of TVPRA violations); *G.W. v. Northbrook Indus., Inc.,* 2022 WL 1644923, at *1–4 (N.D. Ga. May 24, 2022) (the victim's "appearance, her behavior and the number of men coming and going from her hotel room" satisfied the should have known standard.)

The record supports finding Defendant simply turned a blind eye to the rampant prostitution and trafficking occurring on its property in its quest for profits. *See* Ex.3, K.H. 254:10-255:17 (they make you pay extra for heavy foot traffic); Ex.6, Cooper 34:4-11 ("it seems like they would rather turn a blind eye to certain crimes []it's obvious to see what kind of crimes are going on at this hotel day in and day out."); *see also* Ex.8, Porter 35:13-25. Despite the prevalence, Defendant had no safety plan in place to combat the problem and even refused to post an anti-trafficking flyer in its lobby. Ex4, Wertzberger 16:6-19; see also Ex.8, Porter 16:1-17:3 *see also supra.*

And as discussed supra, I.R. exhibited numerous signs of a minor trafficking, there was a constant flow of men to and from the room where I.R. was being trafficked, and she had direct interaction with the hotel manager who warned her of too much traffic while she was fifteen and wearing only a bra. This sort of

evidence is sufficient to allow the jury to reasonably infer that the Defendant knew or should have known of the sex trafficking.[10]

### e. Defendant's Rule 19 Argument Is Inapposite.

Attempting to combat such clear evidence, Defendant argues for summary judgment under Rule 19 because there are other actors who are also responsible such as the traffickers. This argument is not supported by law.

A person is one who should be joined if "the court cannot accord complete relief among existing parties" in the person's absence. Fed. R. Civ. P. 19(a)(1)(A). "The 'complete' relief concept of Rule 19(a)(1) refers to relief as between the persons already parties, not as between a party and the absent [party] whose joinder is sought." *Fair Fight Action, Inc. v. Raffensperger*, 413 F.Supp.3d 1251, 1282 (N.D. Ga. 2019). Moreover, "[i]t has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit." *Temple v. Synthes Corp.*, 498 U.S. 5, 7 (1990). Indeed, the Eleventh Circuit recently reaffirmed this precedent in *Lynn v. O'Quinn*, holding that "where joint tortfeasors may be jointly and severally liable, neither tortfeasor is an indispensable party." 607 F.App'x 931, 934 (11th Cir. 2015) (collecting cases).

---

[10] *See, e.g., S.Y.*, 476 F. Supp 3d at 1257; *A.B.*, 455 F. Supp. 3d at 193-94; *Doe S.W.*, 2020 WL 1244192, *5-6; *H.H.*, 2019 WL 6682152, *3; *M.A.*, 425 F. Supp. 3d at 967-68; *S.Y.*, 2021 WL 2315073 *6-7.

Defendant seems to ignore this well-established rule, arguing instead that certain joint tortfeasors are indispensable parties. First, Defendant argues that Plaintiff's traffickers are indispensable parties due to the TVPRA's participation requirement and contends Defendant's liability "is so connected to Welch's actions that Defendant cannot be held liable unless Welch is also found liable." Doc. 118-1 at p. 19. Even if Defendant's liability depends on a finding that a trafficker violated the TVPRA—that does not make the trafficker an indispensable party.

In fact, the case Defendant relies upon in support of its position rejected the notion that tortious conduct "necessarily requir[ing] more than one participant"— like TVPRA violations—makes all participants indispensable parties. *See Malibu Media, LLC v. Fitzpatrick*, 2013 WL 5674711, at *5 (S.D. Fla. Oct. 17, 2013) (holding that non-parties involved in a BitTorrent scheme to pirate video content were not indispensable, even though scheme necessarily included them). Other courts have likewise rejected similar arguments in holding that a non-party is not indispensable even if Defendant's liability depends on the non-party's liability. E.g., *Ferreira v. City of Binghamton*, 975 F.3d 255, 278 (2d Cir. 2020) (joining employee unnecessary "to obtain respondeat superior liability of the employer"); Nottingham v. Gen. Am. Commc'ns Corp., 811 F.2d 873, 880 (5th Cir. 1987) ("Nor does [Rule 19] require joinder of principal and agent.").

Defendant also seems to argue that the TVPRA might not allow joint and several liability as a basis for summary judgment under Rule 19. While Defendant is correct that the TVPRA is silent on joint liability for a beneficiary claim, the statute as a whole clearly contemplates such liability. *See* 18 U.S.C. § 1593(b) (providing that a restitution order "shall be issued and enforced in accordance with section 3664"); 18 U.S.C. § 3664 (allowing the court to "make each defendant liable for payment of the full amount of restitution"); *see also Leiva v. Clute*, 4:19-cv-87-TLS-JPK, 2020 WL 8514822, at *21 (N.D. Ind. Dec. 16, 2020) (since other portions of statutory scheme has joint and several liability, it applies here)

Defendant also cites *CRS Sirrine, Inc. v. Dravo Corp.*, a case where the defendant argued that the plaintiff could not recover anything without "specifically identify[ing] which aspects of the overall loss were specifically and solely the result of [defendant's] conduct." 219 Ga. App. 301, 303 (1995). However, the Court rejected that argument and held that this would establish an "almost impossible" standard "resulting in nonliability for the defendant even when it is clear that the defendant caused a substantial portion of" plaintiff's damages. *Id.* And interestingly, in the other Georgia cases Defendant relies upon in support its position, the court found that there was a reasonable basis for the jury to determine the appropriate damages flowing from the tortious acts too. *E.g., id.* at 303; *Tucker*

*Nursing Ctr. v. Mosby*, 303 Ga. App. 80, 82-83 (2010); *Scriver v. Lister*, 235 Ga. App. 487, 489 (1998).

In sum, courts considering TVPRA claims have not found non-party venture participants are indispensable parties. *See M.A.,* 425 F.Supp.3d at 974. Thus, Defendant failed to satisfy its burden for dismissal on these grounds. *See Hardy v. IGT, Inc.*, 2011 WL 3583745, at *2 (M.D. Ala. Aug. 15, 2011)(movant "bears the burden of establishing that a party is necessary or indispensable under Rule 19."

## II. Defendant Violated Georgia RICO.

To establish a Georgia RICO claim, Plaintiff must show that (1) Defendant acquired or maintained an interest or control of money, O.C.G.A. § 16-14-4(a); (2) through a pattern of racketeering activity, *id.* § 16-14-3(4); and (3) the racketeering activity harmed the Plaintiff.

### a. Defendant Acquired An Interest In Room Rental Money.

As to the first element, there is evidence Defendant acquired an interest in money through the operation and rentals of its hotel rooms. Contrary to Defendant's assertions, the record shows Defendant acquired and maintained an interest in money through rental of rooms to Plaintiff's traffickers and associates. *See* Ex. 9, I.R. 187:1-25; *see also* Ex.3, K.H. 255:1-17 ( "if they see traffic at your door [from sex work,] they'll make you pay extra. . .")

### b.     Defendant Engaged In A Pattern of Racketeering Activity.

"Racketeering activity" means to "commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit" certain enumerated crimes known as predicate acts. Id. § 16-14-3(5)(A). A pattern requires just two predicate acts. *Id.* § 16- 14-3(4)(A); *Dorsey v. State*, 279 Ga. 534, 540 (2005). The burden of proof for predicate acts in a civil RICO action is preponderance of the evidence. *Williams General Corp. v. Stone*, 279 Ga. 428, 429 (2005) ("Williams I") (rejecting clear and convincing evidence burden).

Plaintiff may establish Defendant is liable for predicate acts not just for direct participation but also as parties to these crimes. "Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime," including anyone who "intentionally aids and abets" or "intentionally advises, encourages, hires, counsels or procures another to commit the crime." O.C.G.A. § 16-2-20(a), (b)(3), (4).  This same principle applies to the commission of predicate acts for civil liability under Georgia RICO. *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1398 (11th Cir. 1994) (one who aids and abets two predicate acts can be civilly liable under RICO). Thus, "a participant in a crime may be convicted of the crime without having directly committed the crime." *Coggins v. State*, 275 Ga. 479, 480 (2002);

*Whaley v. State,* 343 Ga. App. 701, 704 (2017) (everything done by a co-conspirator in furtherance of their common purpose is done by all of them).

As discussed herein, the evidence shows Defendant was "keeping a place of prostitution" and was party to the crimes of "prostitution" and "pimping."

### b(1)    Defendant Was Keeping A Place of Prostitution.

Defendant kept a place of prostitution – which is a predicate act.

> A person having or exercising control over the use of any place or conveyance which would offer seclusion or shelter for the purpose of prostitution commits the office of keeping a place of prostitution when he knowingly grants or permits the use of such place for the purpose of prostitution.

O.C.G.A. § 16-6-10.

> A person commits the offense of prostitution when. . .she performs. . . a sexual act. . .for money or other items of value.

O.C.G.A. § 16-6-9.

Defendant engaged in racketeering activity by keeping a place of prostitution. The evidence described above in discussing Plaintiff's TVPRA claim (*see supra*) is sufficient to create a jury question as to whether Defendant aided sex trafficking at its hotel. Specifically, Plaintiff points to evidence that Defendant generated profits by continuing to renew its business relationship with I.R.'s trafficker and her associates, that Defendant tipped off traffickers and victims when it believed there was too much traffic, Defendant required higher rental rates

if the rooms were used for trafficking, and that traffickers appeared to have access to cameras to watch for when police were coming. And there is evidence that Defendant's manager Vinaben Patel admitted a woman was soliciting at the hotel. And there is evidence of the sheer volume of prostitution reports by police. Plus, the police testimony that the hotel management would not help them. And testimony from the non-profit that the hotel refused to hang an anti-trafficking flyer. And testimony from I.R. and two other victims that all of them were trafficked for sex at the property. And testimony from I.R. that a victim, another minor, was trafficked for sex by Welch at Defendant's hotel. *See Wyndham Hotels*, 519 F. Supp.3d at 1087 (finding sex trafficking victim plausibly alleged two or more predicate acts in state law RICO claim where she alleged sex trafficking occurred "repeatedly" on defendant hotel's premises over a period of three years).

### b(2) *Defendant Was Party To The Crimes Of Pimping And Prostitution.*

Defendant insists it was not "directly associated" with I.R., and therefore, cannot be liable under RICO. But Plaintiffs' claims do not require that Defendant's employees directly sold Plaintiff for sex. Instead, Defendant's helped to those who did—making them "parties to the crime." O.C.G.A. § 16-2-20(a); *Coggins*, 275 Ga. at 480. As discussed herein, there is evidence in the record that Defendant's manager aided in the commission of prostitution by warning I.R. of too much

traffic to the room making them a party to the crime of prostitution and trafficking of I.R.

### b(3)  Defendant's RICO Violations Led To Plaintiff's Injuries.

Contrary to Defendant's assertions, the evidence shows a direct connection between Defendant's predicate acts and Plaintiff's injuries. Georgia law provides a civil cause of action to "any person who is injured by reason of a violation" of Georgia RICO. O.C.G.A. § 16-14-6(c). And "there is no requirement that plaintiff suffer direct harm from each and every alleged predicate act introduced." *InterAgency v. Danco*, 203 Ga. App. 418, 424 (1992); *S. Intermodal Logistics, Inc. v. D.J. Powers Co.,* 10 F.Supp.2d 1337, 1354 (S.D. Ga. 1998) ("a Georgia civil RICO plaintiff does not have to show injury from every predicate act alleged, just "a predicate act"). It is the pattern that must be shown. *InterAgency*, 203 Ga. App. at 42.

The facts of this case leave little doubt that Defendant's actions led directly to Plaintiff's injuries.  Defendant relies on *Wylie v. Denton*, to support their argument that there is no causal connection between the predicate acts and Plaintiff's injuries because there is no evidence showing Plaintiff was an "intended victim" of any alleged predicate acts. 323 Ga. App. 161, 166 (2013).  Contrary Defendant's assertions, *Wylie* does not hold that a RICO Defendant is liable only if

it specifically targets the plaintiff as its intended victim. Instead, *Wylie* reasoned the plaintiff must be a member of the class of victims targeted by the predicate acts.

Judge Ray recently rejected an identical argument asserted by the defendant hotel owners and operators on motion for summary judgement, finding "a jury could find that the predicate acts target the women who were sold for sex and that Plaintiff's injuries were causally connected because Plaintiff was among the class of people targeted by Defendant's predicate acts." Jane *Does 1-4 v. Red Roof Inna, Inc. et al.*,1:21-cv-04278-WMR, ECF Doc. 301, at *15 (NDGA August 10, 2023). As Judge Ray reasoned "[i]t is hard to imagine any party who suffered a more direct injury from keeping a place of prostitution, prostitution, and pimping than the Plaintiff who alleges they were sold for sex through force, fraud, coercion, and deception." *Id.* In the instant case, Plaintiff testified she was sold for sex at Defendant's hotel on multiple occasions which is sufficient to show a direct nexus between Defendant's decision to profit from prostitution and Plaintiff's resulting injuries. *Id.*

### b(4) Defendant Engaged In A RICO CONSPIRACY.

Under Georgia law, a person is deemed to have engaged in a RICO conspiracy "if they knowingly and willfully join a conspiracy which itself contains

a common plan or purpose to commit two or more predicate acts." *Cotman v. State*,

342 Ga. App. 569, 585 (2017). Further, a conspiracy "may be a mere tacit

understanding between two or more people that they will pursue a particular

criminal objective." *Akintoye v. State*, 340 Ga. App. 777, 781 (2017). And, a tacit

understanding may be shown by circumstantial evidence or "by inference as well

as deduction from conduct." *Brown v. State,* 177 Ga. App. 284, 295 (1985). It may

be inferred based upon the nature of the acts done, the parties' relationship, their

interests, and other circumstances. *Studivant v. State*, 309 Ga. 650, 651 (2020). As

discussed above, there is evidence in the record that shows Defendant and the

traffickers shared a common objective of making money, either directly or

indirectly, from the prostitution and trafficking.

## III.    Defendant Violated Georgia's Premises Liability Statute.

The duty of an owner or occupier of land to invitees on its premises is set

forth in O.C.G.A. § 51-3-1 which states as follows:

> Where an owner or occupier of land, by express or implied invitation,
> induces or leads others to come upon his premises for any lawful
> purpose, he is liable in damages to such persons for injuries caused by
> his failure to exercise ordinary care in keeping the premises and
> approaches safe.

O.C.G.A. § 51-3-1.  Defendant violated this statute.

I.R. is an invitee because she was the guest of a tenant. Defendant argues otherwise, but there is "no question that one who rents a hotel room is an invitee on the hotel's premises." J.G., 2022 WL 4482735, at *7. This is because a tenant's guest "is an invitee upon the premises of the landlord where he is invited by the tenant and visits him in such premises." *Frazier v. Godley Park Homeowners Ass'n, Inc.*, 342 Ga. App. 608, 609 (2017). Clearly I.R. was allowed to be on the premises – the manager came by and warned her about foot traffic in front of her room.

The fact that Plaintiff was engaging in (involuntary) commercial sex in the hotel rooms does not change Plaintiff's status as invitee. "[T]he question is not whether Plaintiff engaged in unlawful activity while on[Defendant's] property." *J.G.*, 2022 WL 4482735, at *8. Indeed, O.C.G.A. § 51-3-1 "does not preclude those who commit—or are victims of—unlawful acts from being invitees; rather, the plain language of the statute applies when the 'owner or occupier of the land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose." *Id*. at *8 (*citing Stephens v. Clairmont Ctr., Inc*., 230 Ga. App. 793 (1998)). And "evidence that [Plaintiff] had a dual purpose [in] being on the property" or other evidence that Plaintiff [was a] trespassers does "not

nullify" the evidence Plaintiff was an invitee. *McGarity v. Hart Elec. Membership Corp.*, 307 Ga. App. 739, 744 (2011).

And in fact, even if this Court were to determine Plaintiff was a trespasser as a matter of law, Plaintiff may nonetheless recover because Defendant acted with recklessness. *See Handberry v. Stuckey Timberland*, *Inc.,* 345 Ga. App. 191, 195 (2018) (landlord owes duty to "avoid willfully or recklessly injuring" trespasser and a "duty to warn" if "landowner knows of the peril to the trespasser."); *see also* O.C.G.A. § 51-3-3 (duty to not wantonly injure a trespasser)

Defendant also misstates the facts and law on proximate cause – wrongly positing that Defendant has no duty to guard against foreseeable criminal acts and wrongly arguing that prior complaints of similar crimes cannot make an act foreseeable. But Plaintiff has shown a multitude of similar prior acts and warnings in evidence including online reviews, police reports, police testimony, other victim testimony, and the testimony of a non-profit owner. And Georgia follows a "totality of the circumstances" test when determining crime foreseeability. *See Ga. CVS Pharm,* 316 Ga. at 726. Plaintiff has met that test here.

In a related argument, Defendant argues the proximate cause rules do not apply because Plaintiff's commercial sex acts were voluntary, but that argument ignores I.R.'s testimony to the contrary AND furthermore, minor commercial sex

is never voluntary because Plaintiff did not have the ability to grant consent. *Compare Doc.* 118-1 at p.34 *with* Ex.9, I.R. 191:3-23; 206:2-9; 227:9-25; *In re J.M.,* 276 Ga. 88, 88, 575 S.E.2d 441, 442 (2003)("[t]he Georgia General Assembly has established 16 as the age at which a person can legally consent to sexual intercourse." *citing* O.C.G.A. § 16-6-3(a)).

In any case, "questions of negligence are ordinarily for the jury, plain and indisputable cases may be decided by the court as a matter of law. In such plain cases, the inquiry is not whether the defendant's conduct constituted a cause-in-fact of the injury, but rather whether the causal connection between that conduct and the injury is too remote for the law to permit a recovery." *Tara Bridge Apartments, LP v. Benson*, 365 Ga. App. 647, 651, 879 S.E.2d 531, 535 (2022).

## IV. Defendant Harbored A Nuisance On Its Property.

Defendant does not assert a lack of evidence as to Plaintiff's nuisance claim and because Defendant has not carried its burden; no response is necessary. *See e.g., Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) ("moving party bears the initial burden to show. . .there are no genuine issues of material fact. . .[o]nly when that burden has been met does the duty shift to the non-moving party. . .") Plaintiff will, however, briefly address the claim.

"A nuisance is *anything* that causes hurt, inconvenience of damage to

another." O.C.G.A. § 41-1-1 (emphasis added). "Anything" clearly includes crime or a criminal actor.[11] Under Georgia nuisance law the status of the victim (invitee v. licensee) does not matter. *See, e.g., Mayor etc. of Savannah v. AMF, Inc.*, 164 Ga. App. 122 (1982). Here, the Plaintiff has presented sufficient evidence that Defendant was harboring significant crime on its property including a known trafficker named Welch who approached and ultimately trafficked Plaintiff. Third party crime is considered a nuisance under Georgia law. *Camelot Club Cond. Assoc. v. Afari-Opoku*, 340 Ga. App. 618, 623-624 (2017); *Bethany Group, LLC v. Grobman*, 315 Ga. App. 298, 302 (2012).

## CONCLUSION

For all of the above stated reasons, this Court should deny Defendant Riti, Inc. d/b/a American Inn & Suites' motion for summary judgment.

This 6th day of October, 2023.

[signature on next page]

---

[11] *See, e.g., Bethany Group LLC v. Grobman*, 315 Ga. App. 298, 302 (2012) (Defendant liable for nuisance for maintain a property that allowed crime to fester); *Camelot Club Condo Assn. v. Afari-Opoku*, 340 Ga. App. 618, 624 (2017) ("ample evidence of repeated instances of armed robbery. . .establish[es] a question of fact as to whether the defendant created or maintained a nuisance.")

*/s/ Matthew B. Stoddard*
Matthew B. Stoddard, Esq.
Georgia Bar No. 558215
Belle-Anne B. Cooper, Esq.
Ga. Bar No.: 561983
THE STODDARD FIRM
1534 N Decatur Road NE
Atlanta, GA 30307
P: 470-467-2200
F: 470-467-1300
matt@legalhelpga.com
ba@legalhelpga.com
***Attorneys for Plaintiff***

## CERTIFICATE OF COMPLIANCE & SERVICE

This is to certify that the foregoing document has been prepared with one of the following font and point selections approved by the Court in L.R. 5.1. Specifically, the pleading was prepared using Times New Roman font, point 14. I further certify that I have served a true and correct copy of the foregoing upon all counsel of record using the CM/ECF system, which will automatically send email notification of such filing to the following attorney of record:

**<u>Attorneys for Defendant:</u>**
Brian R. Neary
D. Health Williamson
WEBB, ZCHUNKE, NEARY & DIKEMAN, LLP
One Ameris Center, Suite 1210
3490 Piedmont Road, N.E.
Atlanta, GA 30305
bneary@wznd.net
hwilliamson@wznd.net

This 6th day of October, 2023.

*/s/ Matthew B. Stoddard*
Matthew B. Stoddard